## Elizabeth Smith, Guardian of Matt. C. Jones

### vs.

## Julius Rosenthal, Administrator of the Estate of Henry Jones.[1]

(September 17, 1866.)

1. MARRIAGE—VALIDITY OF DEPENDS ON LAW OF PLACE WHERE SAME TAKES PLACE. The validity of a marriage is to be determined by the law of the place where the ceremony is performed and if valid there it will be valid everywhere.

2. INTERNATIONAL LAW—WAR POWER—EMANCIPATION OF SLAVES. The condition of slaves follows the fortune of war. If the conquering state holds slaves, the slaves merely change masters, if it does not, the slaves are emancipated.

3. MARRIAGE—VALIDITY OF RELIGIOUS MARRIAGE—DUTY OF COURTS. The courts are very cautious in pronouncing against marriages which were celebrated according to the peculiar rules of any religious sect, or according to the manner and customs of any nation or race of people.

4. SLAVES—VALIDITY OF MARRIAGE BETWEEN, UPON EMANCIPATION. A marriage between two slaves is to be treated as valid after emancipation even though during slavery they were deprived of all civil rights. The children born of such a marriage are entitled to all the rights of legitimate children.

Petition of guardian of a minor child to have child born of a slave marriage declared the only heir of the decedent and that the administrator be compelled to pay to the petitioner certain funds in his hands. Heard before Judge Thomas B. Bradwell. The facts are stated in the opinion.

BRADWELL, J.:—

Henry Jones was a colored man and died intestate at Chicago on the 27th day of April, A. D. 1863. Administration was granted by this court on the following day to Julius Rosenthal.

All the assets of said estate have been collected, all debts paid, and the balance of $608.66 is now in the hands of the

[1] This case is reprinted from Vol. II, Sol. Jour. & Rep. p. 81.—Ed.

administrator, subject to the order of court, to be paid to the heirs of the deceased.

Elizabeth Smith, guardian of Matt. C. Jones, appointed by the county court of Brownsville, Tenn., filed her petition in this court alleging that her ward is the only heir of the deceased, and asking that a decree be entered to that effect, and that the administrator be compelled to pay her the balance now in his hands. The administrator answered the petition, and stated that he knew nothing of the matters alleged therein and called for strict proof. On the hearing several depositions were read, all similar to that of William Saughter, which is, in substance, as follows:

"Henry Jones lived for fourteen or fifteen years in Brownsville, Tenn., was of African descent, in color *ashy* black. He was sometimes called Henry Servier, because he was the slave of John Servier of Brownsville, Tenn., which place he left in the latter part of the year A. D. 1862, and went to Chicago. He was married to a girl named Emeline, the black slave of a Mr. William H. Loring of Brownsville, about thirteen years ago, by myself, then a justice of the peace in said town. After the marriage they lived together as husband and wife until the death of Emeline in 1862. They were recognized and regarded as husband and wife by their acquaintances and neighbors during that time. There were two children, the only fruits of that marriage, the one died in infancy, the other, Matt. C, Jones is still alive, resides in Brownsville, and was born on the 4th of September, 1860. Jones never had any other wife or child, or children, than as I have stated. He and his wife were both slaves at the time of this marriage, and were married with the consent of their masters."

It was also proved that when our army advanced into Tennessee, Jones was taken by the military power and sent North under the written order or command to pass "Henry Severe, colored;" that at the time of his death he had obtained a residence in Chicago; and that after his liberation by the military power he often spoke of Matt. C. as

his son, and that he intended his money for him. It was claimed on the argument that the parties, both being slaves at the time of the marriage, could not control or give their consent to such an undertaking, and that the child was consequently a bastard and not capable of inheriting.

Jones' domicile at the time of his death being in this state, his personal property must be distributed according to the law of Illinois, and this law must determine who are his heirs. The validity of the marriage is to be determined by the law of Tennessee, and if valid there, will be valid here, unless there is some statute in Tennessee imposing conditions contrary to the general law of nations which might work as a prohibition of marriage. At the time Jones left Tennessee the constitution of the United States provided that the fugitive should be delivered up on the claim of the party to whom labor or service should be due; but Jones was no fugitive; he had not escaped from labor or service due in Tennessee, and could not then have been taken back legally under this provision of the constitution and the then existing fugitive slave law. He was taken by the strong arm of the Government of the United States, and, at the moment of his capture, his shackles fell—he was transferred from a chattel to a freeman.

Mr. Dana, in a note to his edition of "Wheaton's International Law," sec. 348, in treating of the right to emancipate slaves under the war power, says: "But as persons capable of being used by the will of the master or his state, irrespective of their own will, in war, as soldiers, or as laborers, the occupying sovereign has the right to transfer this faculty of service from the enemy to himself. They are so directly liable to state control in war, that their condition follows the fortunes of the war. And, as the slaves are grouped, at least temporarily, in families, with rights at least moral, in the service and affection and duty of one another, the transfer included the whole slave population—of women, children, and persons not capable of labor—as appurtenant to the laborers. If the occupying state holds slaves, the slaves merely change masters; if it does not, the slaves are emancipated."

Jones having been freed by the war power, I shall treat his case, from the time of his capture, as I would the case of an emancipated slave.

(The learned judge then entered into an elaborate discussion of the natural rights arising out of marriage, and referred to statutes and authorities to show that marriages between slaves were not forbidden in Tennessee or any other southern State. He then proceeded):

Under the civil law, Matt. C. Jones would be declared the legal heir of the deceased, and entitled to his estate, notwithstanding the claim that Jones and his wife were slaves at the time of their marriage. Legitimacy and lawful marriage were some of the pleasing sounds following individual emancipation at Rome hundreds of years ago. Shall it be deprived of these pleasing sounds in the nineteenth century? and shall liberty fail to recognize the marriage relation between slaves when slavery, with all its cruelty, and in the days of its greatest power, when it numbered its victims by millions, was compelled to give a quasi-recognition to this relation? What! when slavery said the cohabitation between the black slave and his wife was innocent and free from sin and under law of God, pure, shall liberty, after emancipation, say that such cohabitation was adulterous, immoral, and sinful, and that the fruits of such marriage are bastards? If so, the emancipated slave may well say, "God deliver me from emancipation."

The courts have always been very cautious in pronouncing against "marriages which were celebrated according to the peculiar rules of any religious sect, or according to the manner and customs of any nation or race of people, as will appear from the following cases:

The supreme court of Missouri, in *Johnson v. Johnson's Adm'r*, 30 Mo. 73, in passing upon the validity of a marriage between a white man and an Indian squaw, says:

"Among the savage tribes of North American Indians,

marriage is merely a natural contract, and neither law, custom, nor religion has affixed any conditions, limitations or forms other than those which nature herself has prescribed. Permanency is not to be regarded as an essential element of marriage by the law of nature; otherwise all such connections as have taken place among the various tribes of the North American Indians—either between persons of pure Indian blood, or between half-breeds, or between the white and Indian races—must be regarded as illicit.''

''The law of states where slavery is prohibited, or not sanctioned, recognizes neither slavery nor property in slaves, within their own territorial limits.'' *Anderson v. Poindexter*, 6 Ohio State, 622, 674.

Judge Skinner in delivering the judgment of the court in *Rodney v. Illinois Central Railroad Company*, 19 Ill. 42, 44, says: ''Slavery in the states where it exists, has its foundation in the municipal regulations of such states, which have no extra-territorial operation, and no binding force in another sovereignty. * * * The owner, therefore, by force of the laws of another state, under the law of Illinois, has no property in the fugitive, and can here, under State authority, assert no property in, or power over him.'' With the law of slavery the reason for the law has passed away, and courts will not recognize the effect of the institution for the purpose of bastardising the issue of the dead or slandering the living. The slave of the Southern states owed service to his master, not by the law of nature, but under the local law, which law fixed the termination of that servitude at the end of the natural life of such slave. The strict legal right to the service is the same in the parent as in the master; the only material difference is in the duration of the term. In the case of the emancipation of the child from the power of the father, the marriage contracted during his servitude is good unless he repudiates it upon arriving at his majority.[1] Apply this principle to the emancipated slave, and a marriage contracted during slavery would be good upon emancipation, if the parties

---

[1] See *Crawford v. Crawford*, 1 Ill. C. C. 453.—Ed.

were all living, and if it is claimed that the right to inherit must be fixed at the time of the death, and that at that time the master of Jones would have taken the estate, it is a sufficient answer to this proposition to say that, in case of the death or incapacity of the person to take, the law looks for the next party entitled to the inheritance. The master has been removed; his claim (if he had any) forever barred; and he has left no successor or representative—he is the last of his race. We look for some one else to take the estate, and find that the constitutional amendment has emancipated his child and removed the only pretended barrier between him and his father's estate—slavery. The common law ignores slavery and all its consequences, and therefore the common law courts are barren of decisions upon the questions now before the court, and I have to determine this case more upon principle than upon the weight of former judicial decisions. Now that slavery has been abolished by the bullets of our soldiers and the ballots of our citizens; that universal liberty is the great corner-stone of this really free republic; that all men stand equal and free before the law; that hundreds of thousands of our bravest sons have shed their blood and lain down lives to establish and maintain in this government the great truths "that all men are created free and equal and are endowed by their Creator with certain inalienable rights; and among these are life, liberty and the pursuit of happiness," and now that the policy of the government, and of the courts, state and national, is in favor of liberty, and that the legislation of congress and of the states is in the spirit of humanity to make, as far as possible, these unfortunate people forget that they were slaves, and to protect them in the full enjoyment of all their civil rights, free from any of the disabilities of slavery or its consequences, it cannot be claimed that the decisions made by the courts of slave states when the policy of the government and the courts was to sustain and perpetuate the power of the master over the slave are to be regarded now in deciding this case; made when all presumptions were in favor of the master and against the

slave, and when in a Southern state to have a black skin was prima facie evidence that a man was a slave, and would compel him in a court to prove his freedom. Were there a thousand of these decisions, made under this influence, in favor of slavery and against the conclusions I have come to in this case, I would brush them aside as I would a spider's web, and decide this case upon what I consider to be the first principles of law, justice and humanity.

I am, therefore, of the opinion that the marriage between Jones and his wife was valid; that during slavery they were deprived of civil rights; that upon the emancipation of Jones and the petitioner they were possessed of their civil rights, and for the purpose of this suit are to be treated as if they had never been slaves; that Matt. C. Jones is the only surviving child of the deceased, and as such entitled to inherit his estate. To come to any other conclusion would be to say that the representatives of a race were bastards; and that millions, for generations, have been living in adultery, when they had done all in their power to make their connection lawful. The view I have taken of this case makes it unnecessary for me to examine the civil rights bill passed by congress, or the enabling act of the Tennessee legislature.''

NOTE.—See the cases of *Lewis v. King,* 180 Ill. 259; *Butler v. Butler,* 161 Ill. 451, on the validity of slave marriages. See also, the case of *Lewis v. Mayo, Adm.,* reported immediately following this case.—Ed.